UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


BADER AL-BABTAIN, et al.,

      Plaintiffs,

v.                           CASE No. 8:06-CV-1973-T-TGW

HANI S. BANOUB,

      Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

        This case concerns a business relationship between the parties that has generated three claims: (1) The plaintiffs claim that they provided $900,000 to the defendant to purchase a yacht, and that he neither purchased the yacht, nor returned the money; (2) the defendant/counterclaimant claims that he is entitled to additional compensation for having obtained business for the counterdefendants with a company named Washington Group International ("WGI"); and (3) the defendant/counterclaimant claims that he is entitled to compensation for obtaining a business opportunity for the counterdefendants with a company named Destinations of the World

("DOTW"). A non-jury trial has been conducted. Based upon the testimony that was presented, and the evidence that was adduced, the following findings of fact and conclusions of law are rendered pursuant to Rule 52(a), F.R.Civ.P., on those three claims. In sum, the evidence establishes that the plaintiffs/counterdefendants are entitled to prevail on all three claims.

### Findings of Fact

1. The plaintiffs are Bader and Abdulmohsen Al-Babtain, who are brothers. They are citizens of Kuwait. A third brother, Abdulrachman Al-Babtain, is not a party to the lawsuit.

2. The defendant Hani S. Banoub is a resident of Florida. He became acquainted with Bader and Abdulmohsen Al-Babtain in Tampa in the 1980's. Banoub subsequently bought some personal items, such as cars and boats, for the Al-Babtain family, and he was compensated for doing so.

3. The Al-Babtains have businesses denominated as Energy Allied (Kuwait), and M/S. Bader Barrak, Al Babtain & Bros. Gen. Trad. & Cont. Co., a/k/a M/S. Bader Al Babtain General Trading Co. ("Trading Company"). These two businesses, along with Bader and Abdulmohsen Al-Babtain, are the subject of an amended counterclaim by Banoub (Doc. 101).

However, Abdulmohsen Al-Babtain was subsequently dismissed from the amended counterclaim (Doc. 122, p. 9).

4. The business relationship between the Al-Babtains and Banoub developed beyond the purchase of personal items. However, contrary to his testimony, Banoub never became a personal advisor to Bader Al-Babtain. Not only do I find Banoub not to be a credible witness for reasons explained later, but I find persuasive Bader Al-Babtain's testimony that he did not need a personal advisor (Doc. 205, p. 30). From all that appears, Bader Al-Babtain was a very successful businessman and he cogently asked why he would need an advisor (id.).

5. Banoub's direct employment with Al-Babtain companies began with the Trading Company in late 1999.

6. The Al-Babtains agreed to allow Banoub to approach non-Kuwaiti companies on behalf of the Trading Company in an effort to procure profitable business relationships in Kuwait. These relationships would take the form of "agency agreements," consistent with Kuwaiti law, whereby the Trading Company would represent the non-Kuwaiti company doing business in Kuwait in return for a fee.

-3-

7. Banoub was required to report his efforts on behalf of the Trading Company to the Al-Babtains and seek authorization before contractually binding the Trading Company.

8. Banoub requested, and the Al-Babtains agreed, that Banoub would be given the title of Vice-President of the Trading Company, and he had business cards reflecting that position.

9. The evidence establishes that the Trading Company and Banoub entered into an oral agreement whereby Banoub would be paid a monthly salary for providing business development services to the Trading Company and be reimbursed for business expenses.

10. There is no probative evidence that Bader Al-Babtain (or any other Al-Babtain) entered into an oral agreement with Banoub to pay him 10% of the gross revenues of any business he brought in. Furthermore, even if there were such an oral agreement, it would not benefit Banoub. Thus, although Banoub made efforts to obtain agency agreements, he did not obtain any that would be covered by an oral agreement. Therefore, there were no gross revenues to which Banoub could claim 10% under the alleged, and unproven, oral agreement. In this respect, Banoub confirmed at trial that he

was only seeking compensation for his efforts regarding WGI and DOTW (Doc. 205, pp. 254-56).

11. On November 7, 2002, Banoub executed an agency agreement with WGI on behalf of the Trading Company. Banoub was responsible for, and negotiated, the WGI agency agreement.

12. The Trading Company established Energy Allied (Kuwait) to facilitate and service the WGI agency agreement. The WGI agency agreement was supposed to be signed with Energy Allied (Kuwait), and not the Trading Company.

13. Because Banoub was responsible for the WGI relationship and the WGI agency agreement, at Banoub's own request, Banoub's employment was transferred from the Trading Company to Energy Allied (Kuwait).

14. On January 2, 2004, Banoub's negotiated agreement with Energy Allied (Kuwait) was reduced to writing at Banoub's request (the "Energy Allied employment agreement"). That agreement stated (Joint Ex. 14)(emphasis in original):

This Employment agreement is made effective as of January 02, 2004, by and between Energy Allied Company of P.O. Box 4083 Hawally 13022 - Kuwait - and Hani S. Banoub of 4209 Woodstorks Walkway Apt# 201. Lutz, FL 33558 - U.S.A.

1.  **Employment.** Energy Allied Company shall employ Hani Banoub as a Vice President. Hani Banoub accepts and agrees to such employment, subject to general supervision, advice and direction of Energy Allied Co. Board of Directors. Hani Banoub agrees to perform faithfully to the best of his ability, experience and talents, the services described as follows: Business Development, New Ventures, General Management Support and Client Services. Hani Banoub is required to report all business activities and potential new ventures or projects directly to the board.

2.  **Base Salary.** As compensation for the services provided by Hani Banoub under this Agreement, Energy Allied Company will pay an annual salary of $72,000 payable monthly on the twentieth of each month. This salary shall increase 5% annually starting June 2004.

3.  **Bonus.** Energy Allied Company will pay a quarterly bonus to Hani Banoub equals [sic] to **5% of Total Gross Revenues** (income) of Energy Allied Company.

4.  **Benefits.** Hani Banoub shall be entitled to employment benefits including annual vacations, holidays, and business class airline travel as provided by Energy Allied Company policies in effect.

5.  **Entire Agreement.** This Agreement contains the entire agreement of the parties and there are no other promises

or conditions considered. Amendments to this Agreement must be made in writing and signed by both parties.

EMPLOYER                          EMPLOYEE
Energy Allied Company

[signature]_____      [signature]_____
Bader Barrak Al-Babtain           Hani S. Banoub
Chairman of the Board             Vice President

15.  Banoub drafted the Energy Allied (Kuwait) employment agreement himself and was present in Kuwait when the agreement was executed.  Banoub testified that he was entitled not only to 5% of gross revenues of Energy Allied (Kuwait) as provided in the written agreement, but also to an additional 10% of gross revenues pursuant to the prior oral agreement with Bader Al-Babtain (Doc. 205, pp. 244-45).  This testimony, which I reject, struck me as patently implausible, particularly in light of the merger provision and the fact that the agreement was drafted by Banoub (id., pp. 245-46).  This is simply one example why I find Banoub not to be a credible witness.

16.  The WGI agency agreement began generating fees for Energy Allied (Kuwait) on January 15, 2004.

17. All revenue derived from the WGI agency agreement came after execution of the Energy Allied (Kuwait) employment agreement, and revenue from the WGI agency agreement ceased around the time Banoub's employment was terminated in November 2005.

18. Other than income earned on invested capital, all Energy Allied (Kuwait) revenue was derived solely from the WGI agency agreement.

19. Banoub was aware of the fact that Energy Allied (Kuwait) (and not the Trading Company) would receive the fees generated from the WGI agency agreement.

20. WGI made several disbursements to Energy Allied (Kuwait) under the contract by wiring payments to the company on January 15, 2004, January 29, 2004, February 12, 2004, March 9, 2004, and May 28, 2004 (Ex. 279). The disbursements, which were made in Kuwaiti Dinars ("KD"), were converted to United States Dollars ("USD"). A WGI employee, Mike Carey, testified that Energy Allied (Kuwait) was paid $1,246,560.63 in agency fees by WGI pursuant to the contract (Doc. 206, pp. 66-67).

21. Banoub's bonuses were tendered in Kuwaiti Dinars. Bonus payments were made to Banoub in the following amounts, which total $18,846.066 KD (Doc. 205, pp. 145-49):

$6,864.500 KD on May 24, 2004 (Joint Ex. 38);

$1,140 KD on June 23, 2004 (Joint Ex. 40);

$2,037.840 KD on June 30, 2004 (Joint Ex. 39);

$1,808.726 KD on August 3, 2004 (Joint Ex. 41);

$6,995 KD on August 23, 2005 (Def. Ex. 292, p. 0157).

22. Five percent of the gross revenues of $1,246,560.63 received under the WGI contract is $62,328.03 USD. Banoub was paid $18,846.066 KD, or the equivalent of $62,820.22 USD in bonuses (Doc. 205, p. 148). With respect to the WGI contract, Banoub was therefore paid all that he was entitled to (and slightly more, due apparently to the currency conversion) (id., p. 149). Correspondingly, I reject the defendant's testimony that he obtained only $25,000 USD on the WGI contract (id., p. 268).

23. On April 16, 2003, the Trading Company made a monetary investment, and entered into a franchise agreement with DOTW, a Dubai company, wherein the Trading Company was to serve as a franchisee.

DOTW is a travel company that wholesales hotel accommodations and ground services to travel agents across the world.

24.    The franchise ownership differed from the "agency agreements" Banoub was authorized to procure on behalf of the Trading Company in that agency agreements required no investment and no ownership was acquired.  There was never an agency agreement between DOTW and the Trading Company.

25.    Very soon after the franchise agreement was signed, Abdulmohsen Al-Babtain (with another investor) purchased the parent, franchisor company of DOTW.  At that time, the franchise agreement was voided and the franchise fee was returned to the Trading Company.  The DOTW franchise never operated.

26.    Bader Al-Babtain was not involved in the franchise purchase, and did not purchase an ownership interest in the DOTW parent, franchisor company until years later in mid-2006.

27.    Banoub testified that he was involved in obtaining DOTW for the Al-Babtains (id., pp. 268-80).  In this respect, Banoub testified that, in connection with the purchase of the company, he reviewed financial

statements, provided input, and met with the owner. He indicated that he expected either a percentage of the gross revenues or an equity interest in DOTW (id., pp. 278-79). He said he asked Abdulmohsen Al-Babtain, "where's my ten percent," and Abdulmohsen Al-Babtain responded, "it's coming, it's coming" (id., p. 280).

28. Banoub's testimony was contradicted by testimony from Abdulmohsen Al-Babtain. Abdulmohsen Al-Babtain testified that a man named Hossam Andraous asked Banoub for Abdulmohsen Al-Babtain's telephone number in connection with obtaining a travel agency franchise in Kuwait, and Abdulmohsen Al-Babtain agreed that Banoub could pass on his telephone number to Keith Fernandez, the general manager of DOTW (Doc. 204, p. 322). Abdulmohsen Al-Babtain talked with Fernandez initially about a franchise, but eventually became partners with him in DOTW. Abdulmohsen Al-Babtain said he had not provided Banoub 5% or 10% of the gross revenues of DOTW because Banoub had no right to it (id., p. 331).

29. I find the following testimony from Fernandez true concerning the events that led to the purchase of DOTW:

Fernandez, as the general manager of DOTW, was asked by a man named Hossam Andraous for a job in the travel industry. Fernandez told him that, if he found the right franchise partner for Kuwait, then Andraous would be made general manager of that franchise. Andraous said that he possibly had the right prospect for the franchise and mentioned Abdulmohsen Al-Babtain's name (Doc. 206, p. 9). At that point, Fernandez had not heard the name Banoub, had not spoken to him, and had not met him. Andraous came back with a telephone number of Abdulmohsen Al-Babtain and said he had gotten the number from Banoub.

Fernandez then called Abdulmohsen Al-Babtain, who showed interest in the franchise. Shortly thereafter, there was a meeting in Kuwait to sign the franchise agreement. Banoub was not present at that meeting. Again, Fernandez had not spoken to Banoub, and had not met Banoub.

At that time, the primary owners of DOTW, the Rostamani family, were seeking to leave the business. Consequently, when Fernandez met with Abdulmohsen Al-Babtain to sign the franchise agreement, it occurred to Fernandez that Abdulmohsen Al-Babtain might be the right partner with which to buy the company.

Fernandez soon called Abdulmohsen Al-Babtain and asked if he was interested in buying the company. Within twenty-four hours, Abdulmohsen Al-Babtain said he was interested and asked for the financial information. Subsequently, Abdulmohsen Al-Babtain said he was still interested in purchasing the company and so Fernandez set up a meeting with the Rostamanis. There was an agreement on price at that point, but further matters needed to be considered.

After speaking with his family, Abdulmohsen Al-Babtain told Fernandez that he was agreeable to purchasing the business. A meeting was set up with the Rostamanis in Dubai to carry out the purchase. Abdulmohsen Al-Babtain flew to Dubai with his wife and with Banoub. This was the first time that Fernandez had met Banoub.

The day following their arrival, Banoub, Abdulmohsen Al-Babtain, and Andraous went to Fernandez's office. While Banoub and Andraous remained behind in that office, Abdulmohsen Al-Babtain and Fernandez went upstairs to the offices of the Rostamani group. Contrary to Banoub's testimony, he was not present at that meeting.

At the meeting, Abdulmohsen Al-Babtain and Fernandez purchased DOTW. Fernandez stated that he has never discussed business

-13-

with Banoub. Fernandez testified that he was familiar with the Al-Babtain family because they were a prominent family in Kuwait. He said that he could have gotten Abdulmohsen Al-Babtain's telephone number himself, but it was easier if it was given to him up front.

30. Having accepted Fernandez's testimony as true, I reject as not credible Banoub's testimony regarding his purported efforts in arranging the purchase of DOTW. This credibility determination is based upon Fernandez's contradictory testimony, other credibility factors previously mentioned, and my conclusion that, in general, Banoub was not a credible witness since, at times, his testimony was vague, evasive, and inconsistent.

31. Accordingly, I find that Banoub's only connection to the purchase of DOTW is that he provided Abdulmohsen Al-Babtain's telephone number to Andraous, who provided it to Fernandez. No one, including specifically the Al-Babtains, agreed to give Banoub any compensation in connection with the purchase of DOTW. Consequently, Banoub is not entitled to any award on his claim regarding DOTW.

32. In the Spring of 2005, the Al-Babtains requested, and Banoub agreed, to purchase a yacht for the Al-Babtains in the United States and ship it to Kuwait.

33. The Al-Babtains intended to pay Banoub for his services, and Banoub expected to be compensated by the Al-Babtains for purchasing the yacht and shipping it to Kuwait. Although the precise amount of Banoub's compensation was never determined, Banoub testified that he was not concerned with the exact amount.

34. Banoub was given some discretion regarding selection of the actual yacht, but was given specific instructions regarding price and speed. Banoub spent time shopping for different yachts that met the given criteria and purported to keep the Al-Babtains advised of his efforts. Ultimately, it was agreed that Banoub would purchase a 62-foot Sunseeker, and ship it to Kuwait.

35. The Al-Babtains, on April 8, 2005, transferred $80,000, and on May 1, 2005, transferred $820,000, from the Trading Company's bank account to Banoub's personal bank account (the "Yacht Funds") for the purchase of a 62-foot Sunseeker. At Banoub's instruction, the Yacht Funds

were not transferred to the United States Energy Allied business account, which was in existence at the time of the transfer.

36. Banoub never purchased a 62-foot Sunseeker (or any other yacht). Both plaintiffs made demand for return of the Yacht Funds. The Al-Babtains, to the time of the trial, had not received a 62-foot Sunseeker, or the Yacht Funds. Banoub said he was holding the funds for the purpose of an offset until there was an accounting. However, he has spent some of the funds for litigation expenses and for living expenses. Banoub was never told that he could keep the funds, even as an offset.

37. The Yacht Funds were transferred from the Trading Company's bank account. In making this transfer, the Al-Babtains took a loan from the Trading Company in order to avoid unnecessary currency conversion costs. The three Al-Babtain brothers, including Abdulrachman, repaid the loan to the Trading Company from their year-end dividends (Doc. 204, p. 42).

38. The funds that were to be used to purchase the yacht were therefore the funds of the three Al-Babtain brothers. In light of Abdulrachman Al-Babtain's 30% interest in the Trading Company, $270,000

of the $900,000 was, in effect, his money. He is not a party to this lawsuit. However, he gave permission to his two brothers to bring this lawsuit (id., p. 139).

39. The yacht was to be placed in the name of Bader Al-Babtain (id., p. 65). This was agreed to by all three brothers because he was the eldest brother (id.). Banoub was instructed accordingly (id.). Banoub acknowledged that "[t]he boat will be in the name of 'Buyer' Bader Barrak Al-Babtain" (Plt. Ex. 59).

## Conclusions of Law

1. This court has subject matter jurisdiction in this case pursuant to 28 U.S.C. 1332, based upon diversity of citizenship and the amount in controversy.

2. No challenge has been raised as to venue.

3. The parties have stipulated that Florida law governs the various claims (Doc. 161, pp. 8-9). While I doubt that the stipulation would withstand analysis under conflict-of-laws principles, no party has asserted that the law of some other jurisdiction should be applied. In view of the absence of a presentation of the law of another jurisdiction, it is appropriate

-17-

to apply Florida law.  <u>Cavic</u> v. <u>Grand Bahama Development Co., Ltd.</u>, 701 F.2d 879, 882-83 (11th Cir. 1983).

    4.  The plaintiffs are entitled to prevail on their claim for breach of an oral contract.  Banoub acknowledges that the parties entered into an enforceable and binding oral contract involving the purchase of a yacht (Doc. 211, p. 4; Doc. 212, p. 11).  He acknowledges further that he received the funds for the purchase (Doc. 211, p. 4).

    5.  Banoub did not purchase a yacht despite having the funds for several months.  Further, he did not return the funds to the plaintiffs upon their demand.  Consequently, he breached the agreement.

    6.  Banoub's only dispute is with the amount that the plaintiffs are entitled to recover.  Specifically, he contends that, because 30% of the $900,000 belonged to Abdulrachman Al-Babtain, and he was not a party to this suit, the plaintiffs can only recover $630,000 (Doc. 212, pp. 11-12).  The defendant initially based this argument on a purported lack of standing under Article III, §2 of the Constitution, so that the absence of a "case" or "controversy" deprives this court of jurisdiction (<u>id.</u>, p. 12).  This argument is incorrect.  The two plaintiffs clearly have standing to sue to recover at least

a portion of the $900,000. Consequently, this is not a suit that should be dismissed for lack of Article III standing. See American Iron and Steel Institute v. Occupational Safety and Health Administration, 182 F.3d 1261, 1274 n. 10 (11th Cir. 1999); Planned Parenthood Ass'n. v. Miller, 934 F.2d 1462, 1465-66 n. 2 (11th Cir. 1991).

7. The plaintiffs assert that Banoub did not plead a defense that the plaintiffs could not recover the portion attributed to Abdulrachman Al-Babtain. The plaintiffs do not develop any argument showing that there are adverse consequences from that failure (see Doc. 213, p. 22; Doc. 216, p. 15). Further, Banoub correctly explains that the issue came up during trial from unanticipated testimony (see Doc. 217, pp. 2-3). Accordingly, I reject the plaintiffs' contention that Banoub's argument is defeated by his failure to plead it.

8. The plaintiffs also contend that it was not necessary to join Abdulrachman Al-Babtain as a plaintiff because, according to the Restatement (Second), Contracts, §298(2), "any joint obligee unless limited by agreement may sue in the name of all the joint obligees for the enforcement of [a] promise by a money judgment" (Doc. 213, pp. 22-23; Doc.

216, pp. 15-16). Banoub responds that, if the three Al-Babtain brothers are joint obligees, then Abdulrachman Al-Babtain was required to be joined as a plaintiff in light of Rule 19, F.R.Civ.P. (Doc. 217, pp. 4-5). Banoub has cited authority supporting that position (id.). On the other hand, since the primary purpose of Rule 19 is to prevent multiple suits and double judgments, Abdulrachman Al-Babtain's permission to file the lawsuit, the fact that the case has been fully tried, and the court's ability to prepare a judgment that will protect Banoub from a duplicative claim, could justify the contrary conclusion.

9. Regardless, this case does not involve joint obligees. Banoub's promise was to purchase a yacht for $900,000 that, the brothers agreed, would be put in Bader Al-Babtain's name (Plt. Ex. 59; Doc. 204, p. 65). Even assuming the brothers had some informal – and non-contractual – understanding about sharing the yacht, the only legal beneficiary of Banoub's promise was Bader Al-Babtain. Consequently, it was only Bader Al-Babtain who was legally injured by Banoub's breach of his promise to purchase the yacht. In other words, Bader Al-Babtain was the sole obligee of the promise. Under these circumstances, Abdulrachman Al-Babtain did

not need to be joined as a plaintiff. For that matter, neither did Abdulmohsen Al-Babtain.

10. The damage that Bader Al-Babtain suffered by Banoub's breach of promise to buy him a $900,000 yacht that would be titled in his name was, obviously, $900,000. Conceivably, Banoub might have attempted to prove that he spent some of the $900,000 in connection with a yacht purchase that should be offset. Similarly, although Banoub was receiving a salary, he possibly could have attempted to show that he was owed some additional compensation for his efforts. However, Banoub presented no evidence either on these matters, or any others, that would reduce the amount Bader Al-Babtain is entitled to recover. Accordingly, judgment will be entered on Count I of the complaint for breach of contract in favor of Bader Al-Babtain in the amount of $900,000. This award extinguishes any potential liability Banoub may have had to Abdulrachman Al-Babtain, as well as to Abdulmohsen Al-Babtain, based upon the failure to purchase a yacht.

11. The plaintiffs contend that they are entitled to prejudgment interest on the $900,000 (Doc. 213, p. 19). "Under Florida law, prejudgment interest is merely another element of pecuniary damages, to be awarded from

the date of loss once a finder of fact has determined the amount of damages and defendant's liability therefor." Gilchrist Timber Co. v. ITT Rayonier, Inc., 472 F.3d 1329, 1331 (11th Cir. 2006), citing Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212, 215 (Fla. 1985). See also Enviro-Ply Manufacturing, Inc. v. Delta Global Funding Corp., 2009 WL 3273275 (M.D. Fla. 2009). Accordingly, Bader Al-Babtain is entitled to prejudgment interest. Banoub has not raised any objection to the award of prejudgment interest. In fact, Banoub claims that he is entitled to prejudgment interest on his claims regarding WGI and DOTW (Doc. 212, p. 21).

The plaintiffs contend that prejudgment interest is to be calculated, at the latest, from November 18, 2005, which was the date Banoub said he would ship the yacht to Kuwait, but did not (Doc. 213, pp. 18-19). Importantly, Banoub has not disputed that date as the starting point for the computation of prejudgment interest. Accordingly, in the absence of a suggestion of a different date, prejudgment interest will be computed from November 18, 2005.

The Al-Babtains do not suggest a rate at which the interest should be calculated and there is no indication, by either party, of some

-22-

contractual agreement for calculating interest. In the absence of a special

contract for an interest rate, in accordance with Fla. Stat. § 687.01, the rate

shall be calculated pursuant to Fla. Stat. § 55.03.* The relevant rates are as

follows:

| YEAR | PER ANNUM | DAILY RATE |
|------|-----------|------------|
| 2010 | 6%        | .0001644   |
| 2009 | 8%        | .0002192   |
| 2008 | 11%       | .0003014   |
| 2007 | 11%       | .0003014   |
| 2006 | 9%        | .0002466   |
| 2005 | 7%        | .0001918   |

The court "must apply the statutory interest rate in effect at the

time the interest accrues." Argonaut Ins. Co. v. May Plumbing Co., supra,

474 So.2d at 216. Therefore, Bader Al-Babtain is entitled to $900,000 plus

interest on the principal amount of $900,000 from November 18, 2005, until

the date of judgment, which has been calculated as follows based upon the

Florida statutory rates:

```
2005 - $900,000 x .0001918 x 44 days  =   $  7,595.28
2006 - $900,000 x .0002466 x 365 days =   $ 81,008.10
2007 - $900,000 x .0003014 x 365 days =   $ 99,009.90
```

---

*Statutory interest rates pursuant to Fla. Stat. § 55.03 are located on the Florida Department of Financial Services's website (http://www.myfloridacfo.com/aadir/interest.htm).

$$2008 - \$900{,}000 \times .0003014 \times 366 \text{ days} = \quad \$ 99{,}281.16$$
$$2009 - \$900{,}000 \times .0002192 \times 365 \text{ days} = \quad \$ 72{,}007.20$$
$$2010 - \$900{,}000 \times .0001644 \times 64 \text{ days} \ \ = \quad \$ \ 9{,}469.44$$

$$\text{TOTAL} \qquad \$368{,}371.08$$

12. In addition to the claim for breach of contract, the plaintiffs' complaint also alleged claims of quantum meruit, conversion, and fraud. The quantum meruit claim was simply alleged as an alternative to the breach of contract claim, and, in light of Bader Al-Babtain's success on that claim, the quantum meruit claim does not need to be addressed (Doc. 213, p. 19 n. 6). Further, the plaintiffs have withdrawn their claim of fraud (id., p. 20).

13. The evidence does not support a finding of conversion. Under Florida law, "[c]onversion is an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." United Technologies Corp. v. Mazer, 556 F.3d 1260, 1270 (11th Cir. 2009)(quotation omitted). The plaintiffs, to establish a conversion claim involving money, must demonstrate, by a preponderance of the evidence, proof that the funds are specific and identifiable. Belford Trucking Co. v. Zagar, 243 So.2d 646, 648 (Fla. App. 1970). "Money is capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is

-24-

special and the identical money is to be kept for the party making the deposit, or where wrongful possession of such property is obtained." Id. Moreover, a tort action is inappropriate where the basis of the suit is a contract. Id.

In this case, the funds were wired in two separate transactions to Banoub's personal banking account and thus were not specific and identifiable. Further, Banoub was not under an obligation to keep intact the $900,000 the plaintiffs gave him to purchase a yacht, and there was evidence that he spent some of the funds on services related to the yacht, as well as on some matters unrelated to the yacht. Accordingly, the Al-Babtains failed to establish a sufficient evidentiary basis to find Banoub liable for conversion.

The Al-Babtains, on the conversion count, are attempting to transform a contract dispute into a conversion claim. However, "a mere obligation to pay money, generally, may not be enforced by a conversion action." Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc., 777 F.2d 1504, 1507 (11th Cir. 1985)(quotation omitted). Furthermore, as 30% of the funds came from the plaintiffs' third brother, Abdulrachman Al-Babtain, any claim of conversion would face the hurdle of the applicable joinder rules under Rule 19, F.R.Civ.P.

For these reasons, Count III of the complaint alleging conversion will be dismissed.

14. Turning to the defendant's counterclaim, Banoub acknowledges that his claims for damages are limited to WGI and DOTW. However, he is not entitled to any award with respect to either entity.

15. As to WGI, Banoub claims that he was not paid the bonuses to which he was entitled. Under the Energy Allied (Kuwait) employment agreement, which Banoub drafted, he was to receive a quarterly bonus equal to 5% of the total gross revenues of the company. The only gross revenues came from WGI. The evidence establishes that Banoub was paid slightly more than 5% of those gross revenues. Consequently, there was no breach of the employment agreement.

16. The conclusion that Banoub received everything he was entitled to with respect to WGI makes it unnecessary to address other contentions raised regarding the WGI claim, such as the Statute of Frauds, and unclean hands.

17. With respect to DOTW, Banoub asserts several theories of recovery. They are all baseless.

Banoub contends first that he is entitled to 10% of DOTW's gross revenues, which amounts to more than five million dollars (Doc. 212, p. 17) based upon an oral agreement with Bader Al-Babtain (Doc. 211, pp. 14-16; Doc. 212, pp. 15-17).

However, as previously found, Bader Al-Babtain did not employ Banoub as a personal advisor, and neither he, nor any other Al-Babtain, entered into an oral agreement with Banoub to pay him 10% of the gross revenues he brought in. Furthermore, both plaintiffs testified that there was no agreement to pay 5% of the gross revenues until the written agreement was signed (Doc. 204, p. 238; Doc. 205, p. 81), and I accept that testimony.

In all events, there is no evidence even suggesting that such an oral agreement would cover the travel business of DOTW that Abdulmohsen Al-Babtain purchased. The DOTW business was not only distinct from agency agreements, but entirely different in kind from that type of business. Accordingly, there was no oral agreement that would call for paying a bonus based on revenues of DOTW.

18. Banoub also seeks recovery of 5% of the gross revenues of DOTW, which is more than $2.7 million dollars, based upon his employment

-27-

agreement with Energy Allied (Kuwait) (Doc. 212, p. 18). There is nothing on the face of that agreement that supports Banoub's claim.

Banoub attempts to get some mileage from the fact that his services are said to include "new ventures" (Joint Ex. 14). However, the contract provided that Banoub's employment was "subject to general supervision, advice and direction of Energy Allied Co. Board of Directors," and he was "required to report all business activities and potential new ventures or projects directly to the board" (id.). There is no evidence that Banoub ever reported DOTW to the Energy Allied board of directors as a potential new venture. The reason he did not do so, of course, is that neither he, nor anyone else, thought that Abdulmohsen Al-Babtain's purchase of DOTW would be a new venture for Energy Allied (Kuwait).

Furthermore, DOTW was not even a "new" venture. Its purchase predated the January 2, 2004, employment agreement.

In addition, the employment agreement would not call for the payment of bonuses based on DOTW's gross revenues. The agreement provided for a bonus of "5% of Total Gross Revenues (income) of Energy Allied Company" (Joint Ex. 14). However, DOTW did not generate any

gross revenues for Energy Allied (Kuwait); only WGI did, and, as explained, the bonuses related to that business were fully paid. Since DOTW did not produce any gross revenues for Energy Allied (Kuwait), the bonus provision in that company's employment agreement did not entitle Banoub to any compensation.

19. Banoub's final argument for damages based upon DOTW is unjust enrichment (Doc. 211, p. 18; Doc. 212, p. 18). In order to succeed on this claim, Banoub must prove that he has conferred a benefit on a counterdefendant, that the counterdefendant must have knowledge of that benefit, that the counterdefendant has voluntarily accepted and retained the benefit, and that it would be inequitable for the counterdefendant to retain the benefit without paying its value to Banoub. Tooltrend, Inc. v. CMT Utensili, SRL, 198 F.3d 802, 805 (11th Cir. 1999).

Banoub seemingly advanced this claim in the hope that his version of the facts regarding the DOTW purchase would be accepted. However, that version was rejected. Banoub does not develop any argument that he is entitled to recover damages pursuant to a theory of unjust enrichment under the facts that have been found.

-29-

In short, the business relationship between Abdulmohsen Al-Babtain and DOTW arose from a meeting between DOTW's general manager, Keith Fernandez, and Hossam Andraous, who was seeking employment in the travel industry. Andraous, without any input from Banoub, mentioned Abdulmohsen Al-Babtain's name to Fernandez as a possible DOTW franchisee in Kuwait. Banoub's only connection to the purchase of the franchise was that Andraous asked Banoub for Abdulmohsen Al-Babtain's telephone number, and Banoub provided it. That is the total extent of Banoub's role in the purchase of the Kuwait franchise. Moreover, Fernandez testified that he could have gotten Abdulmohsen Al-Babtain's telephone number himself. When Abdulmohsen Al-Babtain and Fernandez then joined together to buy the DOTW company, Banoub played no part in that purchase. Under these circumstances, Banoub has not shown any of the elements of unjust enrichment, much less all of them. See <u>Ship Construction and Funding Services (U.S.A.), Inc.</u> v. <u>Star Cruises, PLC</u>, 135 Fed. Appx. 218, 220-21 (11th Cir. 2005)(unpub. dec.).

20. Banoub argues further that he "is akin to a real estate broker" (Doc. 211, p. 19). He is not. As the plaintiffs point out, he is not

licensed like a real estate broker. Further, there is no evidence that he operates a business that is like that of a real estate broker.

In any event, even if he were akin to a real estate broker, he could not recover under the facts of this case on a theory of unjust enrichment. In order for a broker to recover in Florida for unjust enrichment, he must show either the existence of an implied contract to pay for the services in finding the ultimate purchaser, or that he was the procuring cause of the sale. <u>Media Services Group, Inc.</u> v. <u>Bay Cities Communications, Inc.</u>, 237 F.3d 1326, 1329 (11th Cir. 2001).

The evidence certainly does not establish the existence of an implied contract to pay for Banoub's services in finding the ultimate purchaser. After all, Banoub's services consisted of no more than providing Abdulmohsen Al-Babtain's telephone number, which was otherwise available.

Further, in order to be a procuring cause, Banoub must have, at least, brought the parties together. <u>Id</u>. The evidence shows that he did not do that.

Notably, in R.C. Hilton Associates, Inc. v. Stan Musial and Biggie's, Inc., 702 F.2d 907 (11th Cir. 1983), a case cited by Banoub, the real estate broker brought together the seller and the ultimate purchaser. Nevertheless, a claim for a real estate commission based on a theory of unjust enrichment was rejected. That case demonstrates, a fortiori, that Banoub's claim of unjust enrichment in this case is meritless.

21. The three theories under which Banoub seeks damages with respect to DOTW all fail.

22. Banoub is not entitled to any relief on his counterclaim. Accordingly, it will be dismissed.

23. The joint pre-trial statement (Doc. 161) indicates that other contentions have been raised in the pleadings in this case. To the extent that they have not been argued in the three sets of post-trial submissions, they are deemed abandoned.

24. Judgment shall be entered in favor of Bader Al-Babtain, and against Hani S. Banoub, in the amount of $900,000, with an additional $368,371.08 in prejudgment interest. Postjudgment interest shall accrue at

the rate of 0.33%. The counterclaim shall be dismissed. The Clerk will enter judgment accordingly and close this case.

IT IS SO ORDERED.

DONE and ORDERED at Tampa, Florida, this 5th day of March, 2010.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE